**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

DWAYNE HUSTON, an individual,

Plaintiff,

v.

VERIZON FEDERAL NETWORK SYSTEMS, LLC, et al., inclusive,

Defendants.

2:07-CV-00201-BES-LRL

**ORDER**

Presently before the Court is Defendant Federal Network Systems, LLC's ("FNS") Motion for Summary Judgment (#22), filed on November 29, 2007. On January 30, 2008, Plaintiff Dwayne Huston filed his Opposition to Defendant's Motion for Summary Judgment (#39). Huston's opposition, however, was stricken per the Court's order of February 6, 2008. Order (#46) 3.) Thus, FNS's motion is unopposed.

## I. BACKGROUND

Huston was employed by FNS as Staff Consultant Project Manager ("site manager") from October 2002 to July 13, 2005. (Walker Aff. (#26) Exs. 2, 17.) Prior to serving as site manager, Huston worked for FNS in other capacities, dating from 1986. See id. at Ex. 2. As site manager, Huston regularly interacted with employees of Bechtel. (Feinberg Aff. (#25) ¶ 3); see also (Huston Dep. 41:20-25.)[1] Bechtel was a client of FNS and held a

[1] Huston's deposition can be found attached to the Walker Affidavit (#26) as Exhibit 1.

contract with the Department of Energy on Huston's worksite. (Feinberg Aff. ¶ 3.)

On April 26, 2005, Huston made a comment to Mary Granoski, an FNS employee who worked under Huston. (Walker Aff. Ex. 8.) Specifically, Huston stated that it "looks like Mary is trying to regain her youth by wearing those hip hugger jeans." (Huston Dep. 65:1-4.) In response, Granoski said that she did not permit anyone to talk to her that way except for her husband. Id. at 67:9-13. A few moments later, Huston then hit Granoski on her hip with a rolled-up piece of paper and tole her to "keep up the good work and have a good day." Id. at 65:11-24. The following day, Granoski requested a meeting with Huston and Terrance Stanton, an FNS employee who witnessed Huston's comment to Granoski the day before. Id. at 70:23-71:15. Granoski told Huston she had been offended by his behavior and that she did not know what she was going to do about it. Id. at 73:3-23. Huston apologized and said he had not intended to sexually harass Granoski. Id. Huston also sent Granoski an apology email on April 28, 2005. (Walker Aff. Ex. 8.) On April 29, 2005, Granoski submitted a complaint for sexual harassment against Huston. Id. The same day, Huston was advised not to have any further contact with Granoski. (Huston Dep. 91:20-22.)

Ann Hamilton was assigned to investigate Granoski's claim. (Walker Aff. Ex. 11.) During the course of the investigation, Huston admitted to having commented on Granoski's pants, and he also admitted to having hit Granoski on the hip with a rolled-up piece of paper. Id. Other allegations of inappropriate behavior were also substantiated during the investigation, including the claim that Huston had downloaded sexually explicit adult content to his FNS-issued laptop computer. Id.

On May 25, 2005, Huston was contacted by Tom Willis, a Bechtel employee. (Huston Dep. 99:17-20.) Willis told Huston that Thelma Sener, an FNS employee, had announced during a conference call that Huston was being terminated for sexual harassment, and he asked Huston when his last day would be. Id. at 100:10-101:13. Huston told Willis that there was an investigation ongoing but that he could not comment any further. Id. at 100:5-9.) In late May, Huston contacted Jeffrey Feinberg, one of

Huston's supervisors. Id. at 121:19-122:8.) Huston asked Feinberg what the company policy was with regard to the existence of pornography on an FNS-issued computer. Id. Feinberg suggested to Huston that in situations where pornography had been found on FNS-issued computers in the past, employees had been terminated. Id. at 123:4-124:13. Feinberg further suggested that if that was the case, Huston's best option would be to resign. Id.; (Feinberg Aff. (#25) ¶ 7.)

On May 26, 2005, Huston resigned, making his resignation effective July 8, 2005.[2] (Walker Aff. Ex. 14.) In his deposition, Huston stated that he felt resignation was appropriate because the way Granoski's complaint had been investigated made it impossible for him to "maintain a good role or the same role that [he] had previous to that." (Huston Dep. 126:7-13.) He also stated that there was an opening at Bechtel that he expected to be hired to fill. Id. 126:14-20. On May 27, 2005, Huston applied for a position with Bechtel. (Walker Aff. Ex. 15.)

On June 2, 2005, Huston's immediate supervisor, Doug Gilbert, and Gilbert's supervisor, Feinberg, held a meeting with FNS employees assigned to the Bechtel account. Id. at 135:16-21; (Feinberg Aff. (#25) ¶ 9.) Huston was not at the meeting. Id. at 137:16-18. During the meeting, Gilbert and Feinberg told the employees that Huston had resigned. Id. 135:16-21. According to Huston, Gilbert and Feinberg also told the employees that there was an investigation ongoing, and they reminded employees of the company's policy prohibiting the discussion of ongoing investigations. Id. at 135:22-25, 136:24-137:8.

That same day, Gilbert and Feinberg met with Dave Belangia, Bechtel's information technology manager, and Tony Friscia, Bechtel's communications manager. Id. at 139:11-23; (Feinberg Aff. (#25) ¶ 10.) The group met pursuant to a contract provision requiring FNS to give Bechtel thirty days notice of a change in site management. (Feinberg Aff.

---

[2]It is not clear whether Huston resigned before of after he contacted Feinberg about FNS's policy regarding the presence of pornographic material on an FNS-issued laptop computer. (Huston Dep. 124:15-125:10.)

(#25) ¶ 11.) During the meeting, Belangia and Friscia informed Gilbert and Feinberg that Huston had recently applied for a position with Bechtel that would require Huston to work on the same site as FNS employees. Id. ¶ 13. Belangia and Friscia also advised Gilbert and Feinberg that they were aware that an investigation of Huston was ongoing. Id. ¶ 12. Feinberg confirmed that the investigation was ongoing but did not go into the substance of the investigation. (Huston Dep. 142:22-143:1); (Feinberg Aff. (#25) ¶ 12.) Belangia asked Gilbert and Feinberg if there would be any problem if Huston was hired by Bechtel. (Huston Dep. 139:11-23); (Feinberg Aff. (#25) ¶ 13.) Feinberg said that there would be no problem if Huston were hired so long as his interaction with FNS employees was limited to management employees only. (Huston Dep. 139:11-23, 143:16-22, 148:2-14); (Feinberg Aff. (#25) ¶ 13.) Either Belangia or Friscia responded by saying, "Don't worry, if he inappropriately touches a woman or uses his computer to surf pornography, I'll fire him." (Feinberg Aff. (#25) ¶ 14.)

On June 8, 2005, Huston interviewed with Willis and Charlie McNeil, another Bechtel employee. (Huston Dep. 144:2-145:7.) After the interview, Willis and McNeil recommended Huston for a second interview. See id. at 146:5-11. Willis and McNeil noted that Huston had achieved the highest score according to an internal rating scale of any candidate they had interviewed. Id. at 146:13-19. In late June, Huston interviewed with Belangia and Friscia. Id. at 147:1-8. During the interview, Belangia conveyed to Huston what had been discussed by Belangia, Friscia, Gilbert, and Feinberg during their June 2, 2005 meeting. Id. at 147:9-15. In particular, Belangia told Huston that he and Friscia had asked Gilbert and Feinberg if they would have any problem if Bechtel hired Huston. Id. Belangia told Huston that Gilbert and Feinberg had indicated that as long as Huston only had contact with managerial employees, there would be no problem. Id. at 147:9-14. Belangia then told Huston that he could not offer him a position at that time. Id. at 148:22-25. According to Huston, Belangia said that he could not offer him the position because of the investigation pending against him. Id.

On July 1, 2005, Huston attempted to rescind his resignation. Id. at 175:15-21. On

July 6, 2005, Hamilton submitted an investigation summary in which she recommended that Huston be terminated. (Walker Aff. Ex. 11.) On July 12, 2005, Karen Holmquest, FNS's human resources manager, sent Huston a termination lettering noting that he was being fired for violating company policy and the code of business conduct, including the provision prohibiting sexual harassment. Id. at Ex. 17.

On November 9, 2006, Huston filed a complaint in state court alleging claims for defamation, injurious falsehood, false light publicity, publication of private facts, tortious interference with business relations/prospective economic advantage, and negligence. (Compl. ¶¶ 12-45.)[3] On February 15, 2007, the case was removed to federal court. (Notice of Removal (#1).) On November 29, 2007, the motion for summary judgment currently pending before the Court was filed. (Mot. Summ. J. (#22).)

## II. LEGAL STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party, and for this purpose, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Martinez v. City of Los Angeles, 141 F.3d 1373, 1378 (9th Cir. 1998). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. Lynn v. Sheet Metal Workers Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986); S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982).

If the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, then the respondent must show by specific facts the existence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

[3] Huston's complaint can be found attached to the Notice of Removal (#1).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 243-50 (citations omitted). "A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." British Airways Board v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978); see also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596 (1993) ("[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free . . . to grant summary judgment."). Moreover, "[i]f the factual context makes the non-moving party's claim of a disputed fact implausible, then that party must come forward with more persuasive evidence than otherwise would be necessary to show there is a genuine issue for trial." Blue Ridge Ins. Co. v. Stanewich, 142 F.3d 1145, 1143 (9th Cir. 1998) (citing Cal. Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987)). Conclusory allegations that are unsupported by factual data cannot defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

## III. Discussion

### A. Defamation, injurious falsehood, false light publicity and public disclosure of private facts

Huston's claims for defamation, injurious falsehood, false light publicity and public disclosure of private facts are based on three statements: (1) Sener's statement overheard by Willis that Huston was being fired for sexual harassment; (2) the June 2, 2005, internal announcement that Huston had resigned, that there was an investigation ongoing, and that employees should refrain from discussing workplace investigations; and (3) the statements by Feinberg at the June 2, 2005 meeting with Belangia and Friscia noting that Huston had resigned, confirming that Huston was under investigation, and stating in response to Belangia and Fiscia's inquiry that FNS would have no problem if Huston were hired by

Bechtel so long as Huston's interaction with FNS employees could be limited to management employees.

**1. Defamation**

"A Defamation claim requires demonstrating (1) a false and defamatory statement of fact by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." Pope v. Motel 6, 121 Nev. 307, 315, 114 P.3d 277, 282 (2005). Here, the statements on which Huston bases his claims are all indisputably true. On May 25, 2005, Sener stated that Huston was being fired for sexual harassment. (Huston Dep. 100:10-101:13.) On July 12, 2005, Huston was terminated for, among other things, sexual harassment. (Walker Aff. (#25) Ex. 17.) Thus, the statement was true. See Kraus v. Brandstetter, 562 N.Y.S. 2d 127, 130 (N.Y. App. Div. 1990) (holding that a doctor's statement to a group of nurses about the vice president of nursing services that "[y]ou nurses will receive your Christmas bonus early, your boss is going to get fired" was substantially true because the vice president of nursing services was fired after the doctor made the comment).

The statements made by Gilbert and Feinberg at the June 2, 2005 employee meeting were also true. It is not disputed that at the time Huston had already resigned from FNS and that an investigation was ongoing. (Huston Dep. 135:16-136:20); (Walker Aff. (#25) Ex. 14.) It is also not disputed that FNS had a workplace policy prohibiting the discussion of internal investigations. See id. at 136:24-137:8; (Feinberg Aff. (#25) ¶ 9.) To the extent that Gilbert and Feinberg relayed the same information to Belangia and Friscia, those statements are likewise not actionable.

The statement that Feinberg would have no problem if Bechtel hired Huston so long as his contact with FNS employees was limited to managerial employees is also not actionable. The statement does not convey an objective fact about Huston. Rather, it conveys Feinberg's position as to the ramifications of Huston's hiring at Bechtel, which is relevant to the Bechtel/FNS relationship insofar as Bechtel and FNS employees work at the same site. To the extent that the statement can be viewed as implicitly conveying an

evaluation of Huston's suitability for employment generally, it can only be construed as reflecting Feinberg's opinion as to whether tensions might arise as a result of Huston's presence on the worksite, not veiled assertions of any particular fact–i.e., whether Huston had committed sexual harassment or whether he was competent to perform the duties assigned to him. Therefore, the statement is not actionable. See Pegasus v. Reno Newspapers, Inc., 118 Nev. 706, 714, 57 P.3d 82, 87 (2002) ("Statements of opinion cannot be defamatory because 'there is no such thing as a false idea.'").

Furthermore, the statements made during the June 2, 2005 meeting between Bechtel and FNS management were conditionally privileged. "A qualified or conditional privilege exists where a defamatory statement is made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or a duty, if it is made to a person with a corresponding interest or duty." See Circus Circus Hotel, Inc. v. Witherspoon, 99 Nev. 56, 62, 657 P.2d 101, 105 (1983). Here, Bechtel and FNS share a common interest in the joint worksite by virtue of the contractual arrangement between the two. Moreover, Gilbert and Feinberg only gave information pursuant to the terms of the contract (the fact that Huston had resigned) and in response to direct questions concerning Huston's suitability for employment (the fact that there was an ongoing investigation, and that FNS would have no problem with Bechtel hiring Huston so long as his contact with FNS employees was limited to managerial employees). Therefore, the communications were privileged. See id., 99 Nev. at 63 n.3, 657 P.2d at 105 n.3 ("A former employer has a qualified or conditional privilege to make otherwise defamatory communications about the character or conduct of former employees to present or prospective employers, as they have a common interest in the subject matter.")

**2. Injurious Falsehood**

The Restatement (Second) of Torts establishes liability for injurious falsehood where "[o]ne who publishes a false statement harmful to the interests of another" and "(a) . . . intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b)

he knows that the statement is false or acts in reckless disregard of its truth or falsity." Restatement (Second) Torts § 623A (1977). Here, as stated, the statements at issue were true. Moreover, the statements made during the June 2nd meeting between Belangia, Friscia, Gilbert and Feinberg were privileged. See Restatement (Second) of Torts § 646A (1977) (recognizing the availability of the conditional privilege with respect to claims for injurious falsehood).

**3. False Light Publicity**

"One who gives publicity to a matter concerning another that places the other before the public in false light is subject to liability to the other for invasion of his privacy." Restatement (Second) Torts § 652E (1977). "'False light, like defamation, requires at least an implicit false statement of objective fact.'" Flowers v. Carville, 266 F. Supp. 2d 1245, 1252 (D. Nev. 2003). "'Publicity' . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) Torts § 652D cmt. a (referred to in Restatement (Second) Torts § 652E cmt. a); see also Kuhn v. Account Control Tech., Inc., 865 F. Supp. 1443, 1448 (D. Nev. 1994) (discussing § 652D cmt. a in relation to the tort of public disclosure of private information). Here, as has been stated, the statements at issue were true. Beyond that, none of the statements were uttered to more than a few co-workers or employees of a potential employer and thus do not constitute "publicity" within the meaning of the Restatement.

**4. Public Disclosure of Private Facts**

Huston asserts a claim for public disclosure of private facts. "To maintain a cause of action for public disclosure of private facts one must prove that a public disclosure of private facts has occurred which would be offensive and objectionable to a reasonable person of ordinary sensibilities." Montesano v. Donrey Media Group, 99 Nev. 644, 649, 668 P.2d 1081, 1084 (1983) (citations omitted). The communication of a private fact to a single person or even a small group of persons is not sufficient to establish a claim for public disclosure of private facts. Kuhn, 865 F. Supp. at 1448 (citing the Restatement

(Second) Torts § 625D cmt. a (1977)). Here, the private facts at issue were communicated at most to a relatively small group of Huston's co-workers and a potential employer. Therefore, his claim for public disclosure of private facts must fail. See Kuhn, 865 F. Supp. at 1448 (holding that the communication by a debt collector of the fact of a debt owed to several of the plaintiff's co-workers was not sufficient to establish a claim for public disclosure of private facts).

**C. Interference with Prospective Economic Advantage**

Huston alleges a claim for interference with prospective economic advantage. Under Nevada law, the tort of intentional interference with prospective economic advantage requires a plaintiff to show: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct." Wichinsky v. Mosa, 109 Nev. 84, 88, 847 P.2d 727, 729-30 (1993) (citing Leavitt v. Leisure Sports, Inc., 103 Nev. 81, 88, 734 P.2d 1221, 1225 (1987)).

Huston's interference with prospective economic advantage claim appears to be based on the comments made by Gilbert and Feinberg during the June 2, 2005 meeting between Gilbert, Feinberg, Belangia and Friscia. As has been stated, however, the statements made by Gilbert and Feinberg at that meeting are subject to the conditional privilege and therefore cannot support a claim for interference with prospective economic advantage. Beyond that, no evidence has been brought to the attention of the Court to support the conclusion that Feinberg intended to harm Huston by preventing his hiring at Bechtel. Insofar as Huston bases this claim on Sener's comment during the conference call, there is no evidence that Sener knew of the prospective relationship between Huston and Bechtel (to the extent there was one), nor is there any evidence that she intended to harm Huston by preventing the relationship.

**D. Negligence**

Huston alleges a claim for negligence. "To prevail on a negligence theory, the

plaintiff generally must show that: (1) the defendant had a duty to exercise due care towards the plaintiff; (2) the defendant breached the duty; (3) the breach was an *actual* cause of the plaintiff's injury; (4) the breach was the *proximate* cause of the injury; and (5) the plaintiff suffered damage. Perez v. Las Vegas Med. Ctr., 107 Nev. 1, 4, 805 P.2d 589, 590-91 (1991) (citation omitted).

Assuming a duty was owed to Huston, no evidence has been brought to the Court's attention that supports the conclusion that FNS breached a duty owed to Huston to conduct a careful, thorough investigation. FNS policies and procedures provide that "[e]mployees' reports will be kept confidential to the extent permitted by law and the company's ability to address concerns." (Walker Aff. (#25) Ex. 18.) They further provide that "[i]n certain instances, employees' names may be provided to those persons involved in the investigation or with a 'need to know' about the situation." Id. And as to those employees interviewed in the course of an investigation, the policies provide that "[w]hen conducting interviews with employees explain that the interview is confidential." Id. These policies are consistent with any duty owed to Huston by FNS. No evidence has been put before the Court to suggest that the investigation into Granoski's complaint was not undertaken in accordance with these procedures.

In light of the foregoing, there being no genuine issue of material fact as to Huston's claims in this matter, the Court grants summary judgment in favor of FNS.

**IV. CONCLUSION**

Accordingly, IT IS ORDERED that FNS's Motion for Summary Judgment (#23) is GRANTED.

IT IS FURTHER ORDERED that the Clerk SHALL ENTER JUDGMENT in favor of Federal Network Solutions and against Huston on all claims and CLOSE THE CASE.

DATED: This 17th day of September, 2008.

UNITED STATES DISTRICT JUDGE